## S. E. BRATTON v. J. E. ROGERS ET AL.

1. RESULTING TRUST. *Title taken as indemnity. Money raised on joint credit. Rights of purchaser.*
   B., the purchaser of a certain tract of land, in order to raise the purchase-money thereof, procured A. to become his surety on a promissory note given to a bank, which upon such joint security furnished the money and it was paid to the legal owner of the land, who at the instance of B. conveyed the title to A., to be held as an indemnity against loss on account of his surety-ship. *Held,* that although the money paid was raised on the joint credit of A. and B., it was the money of the latter and by operation of law a trust resulted in his favor, unaffected by our statute of frauds, § 1296, Code 1880.

2. SAME. *Notice thereof. Possession by tenant.*
   If the purchaser of land from the holder of the legal title thereto have knowledge of the actual occupancy thereof by the tenant of another, he is affected with notice of such landlord's equitable rights in respect to the land. *Taylor v. Mosely,* 57 Miss. 544, cited.

3. ESTOPPEL. *Agency to sell land. Deviation from authority.*
   Authority to an agent to sell land in 1877 upon certain prescribed terms does not estop the principal to repudiate, as against either agent or purchaser, a sale made by such agent upon different terms in 1878.

APPEAL from the Chancery Court of Coahoma County.

HON. W. G. PHELPS, Chancellor.

In 1871 the complainant, Bratton, obtained a decree against the then owners of the lands in controversy in this suit. He was indebted

to his attorneys for their fee and for taxes paid by them to prevent a sale of the lands against which the decree had been rendered. Under an arrangement between complainant and his attorneys the lands were bid off at the sale made under the decree by one of the attorneys, who was to hold them to secure the payment of the debt due by the complainant. In 1872 another arrangement was made by which Reid & Mathews paid the sum due to the attorneys and received a quit-claim deed to the lands. Reid & Mathews held the title only to secure the amount which had been advanced by them. In 1873 the complainant, in order to provide the money to discharge the debt to Reid & Mathews, procured one Thomas J. Armistead to become surety for him on a note executed in favor of the Farmers' and Merchants' National Bank of Charlotte, N. C., and to indemnify him against loss thereby directed Messrs. Reid & Mathews to convey the lands directly to Armistead, which was done. Bratton remained in possession of the lands, and being a non-resident of the State secured the services of the defendant Fuller, who was to act as his agent in renting the lands, paying taxes, etc. In 1876 Fuller, as the agent of Bratton, made a lease of so much of the lands as was cultivable to Dempsey Butler for the term of three years, the term ending January 1, 1879. Under this lease Butler entered upon the lands and continued in possession until the expiration of the term.

Fuller was a merchant, and the account against Bratton was kept upon the books used in his business. In 1876 Rogers became a member of the firm and the account was, for the convenience of Fuller, continued upon the books of the firm. The books were kept by Rogers, who entered the account against Bratton. In this account Bratton was credited with the rents paid by Butler and charged with the taxes of the lands. It appears from certain letters, which passed between Fuller and Bratton in the years 1875, 1876, 1877, and 1878 (which letters were read in evidence without objection) that there was a négotiation between Rogers and Fuller for the sale of the lands to Rogers, but that Bratton refused to assent to the sale on the terms proposed. The complainant, however, made no effort to prove that Rogers ever knew anything of

these letters, or that he ever proposed to purchase the lands from Fuller. In 1877 Armistead, the holder of the legal title, came to Mississippi from North Carolina, where both he and Bratton resided. He was accompanied by one Fleming, who professed to be the agent of Bratton. Armistead on this visit claimed to be the owner in fee of the lands, and Fleming asserted that he was such owner and had full right to convey them. In truth, Armistead was at that time authorized by Bratton to sell the lands at a certain sum, and his purpose in coming to this State was to consummate the sale of all the lands in one body to Rogers. At this time there was a treaty between Armistead and Rogers for the sale and purchase of the lands, but it failed and Armistead returned to North Carolina. On this visit, however, he had the assessment of the lands put in his name and sold a small portion (about twenty acres) to Fuller for the sum of five hundred dollars, for which sum he gave Bratton a credit on the debt. Bratton, being informed of this sale, wrote to Fuller ratifying what had been done. Some time after this Fuller called Bratton's attention to the claim asserted by Armistead as absolute owner of the lands, that the records showed title in Armistead, and said that he, Fuller, doubted if he could any longer recognize Bratton "in a legal sense."

To this Bratton replied, giving a history of the transaction between himself and Armistead and claiming that he was the true owner of the property and Armistead only a mortgagee. He further stated that on a settlement between them the mortgage debt would be wholly or nearly discharged. He denied the right of Armistead to make any sales without his assent, and requested Fuller to give notice to the public of the character of his claim. In July, 1878, Armistead again came to this State and in the presence of Fuller sold to Rogers the most valuable portion of the lands. The portion sold was that which Bratton had declined to sell separated from the remainder, and the price paid was that which he had refused to accept. Both Armistead and Fuller assured Rogers that the title in fee was in Armistead and that he had a good right to sell. At the time of this sale the term of Butler in the premises had not expired, and it was agreed that he

should only be entitled to the possession at the expiration thereof, January, 1879. At that time Rogers took possession and has greatly improved the property, the improvements having all been made under the supervision of Fuller, who was employed by Rogers to superintend the same.

As soon as Bratton learned of the sale he wrote to his attorney, Mr. Reid, instructing him to notify the purchaser of Armistead's want of power to sell. This attorney was examined as a witness and testified that he at once called on Rogers and gave him notice of Bratton's ownership. This fact is denied by Rogers.

In August, 1881, the complainant exhibited his bill, stating his title and averring that both Fuller and Rogers were his agents, to whom he had committed the management of the property ; that being such agents they had bought the land and had taken title in Rogers alone. The prayer of his bill is for a cancellation of the title and for an account of the rents and profits. Armistead demurred to the bill, and upon the demurrer being overruled he permitted a decree *pro confesso* to be taken against him, upon which the court directed its commissioner to convey to the complainant so much of the land as was still held by Armistead. Fuller answered, denying that he had any interest in the land or that he had been in the occupancy thereof since the sale to Rogers. Rogers defends upon two grounds set up by his answer : First, that the trust sought to be fixed upon the land is not enforceable, because not manifested by writing, and, second, that he is a *bona fide* purchaser for value without notice.

On final hearing the Chancellor dismissed the bill as to Rogers and Fuller and the complainant appealed.

*Nugent & McWillie,* for the appellant.

1. The depositions of Bratton, Harman, and Reid fully establish the right of the appellant to relief under repeated adjudications of this court and leave only one loop-hole for escape. As to this— the purchase for value and without notice—we insist that it is not sustained by the evidence. It devolved upon Rogers to *prove this defense.* He shows he paid the purchase-money ; but Julius Allen, who was thoroughly posted as to the land, says that it was worth

double what Rogers gave for it. He does not show that he had no notice of appellant's rights. On the contrary, we think the proof abundantly fixes notice upon him, and the following facts are relied upon as demonstrating it :

(1.) Dempsey Butler was at the time of the purchase in possession of the lands as lessee of appellant, under a lease granted E. B. Fuller as his agent.

(2.) E. B. Fuller was Rogers' partner, and kept an account on the books of himself or firm with Bratton, to which Rogers had access; and this account was not only inspected but made up by Rogers, *as he himself swears.*

(3.) After the purchase by him Rogers had conversation with Reid, appellant's attorney, and told Reid there was a balance due on the rent for 1878 of several dollars; and to Reid's suggestion that he would attach the amount for a debt of Armistead, Rogers replied that the money belonged to Bratton.

(4.) The land was sold to Rogers, who had for several years been trying to buy it from Dr. Bratton for half its value.

(5.) Rogers knew that *Fuller was Bratton's agent,* and acted on his statement that Armistead had good title and right to convey the land.

(6.) One Fleming was present at the sale and represented himself as appellant's agent, but really produced and had no authority to act for him.

2. The purchaser, Rogers, did not buy from Bratton but from Armistead, who was asserting an adversary claim to his knowledge ; and as he knew all the facts and circumstances touching the tenure by which Armistead held the land-title, it was his folly to have trusted to Fuller's representations.

3. He does not testify that he purchased, relying solely on the representations of Fuller, but, on the contrary, refers to this as a mere accidental fact.

4. But the fact is all against the defendant Rogers. It affects him with notice of Bratton's claims, and concludes him from the plea of a *bona fide* purchaser. Again, it is not true that because a man claims to be agent for another in a matter in which he has no

authority to act that the alleged principal is bound, though the so-called agent is intrusted with a restricted authority touching the subject-matter. The law of estoppel does not apply. The acts of a general agent will bind his principal so long as he keeps within the general scope of his authority though he may act contrary to his private instructions; but an agent constituted for a particular purpose and under a limited power cannot bind his principal if he exceed that power. The special authority must be strictly pursued. Whoever deals with an agent constituted for a special purpose deals at his peril when the agent passes the precise limit of his power. 2 Kent's Com. 620, 621*.

5. There is another view which is conclusive of the case. Fuller was agent of Bratton, and this Dempsey Butler, tenant, was in actual possession of the land for his principal, Bratton, and Rogers was aware of the fact.

*Frank Johnston,* for the appellees.

1. Rogers had no notice of complainant's alleged equity.

In the first place, the averment of notice made in the bill is met by a full denial in the answer.

Rogers in his deposition denies that he had notice, and Fuller denies ever having given him any such notice or information.

Bratton in his testimony fails to state a fact which implies notice to Rogers, though he expresses the opinion that Rogers knew of his claim.

Mr. Reid in his testimony says he gave Rogers notice, *but long after his* purchase, while Rogers differs from Mr. Reid, and says that Mr. Reid never gave him any notice of complainant's equity.

So there is no evidence that Rogers had notice, but, on the contrary, all the direct evidence is that he was a purchaser for value without notice of complainant's claim.

I deny that Mr. Rogers was in a position that put him on inquiry.

But if he was under any duty to inquire, his inquiry would have led him to Mr. Armistead, and would have ended in Armistead's assurance that he was the owner of the land; or would have led him to Fleming, which would have brought the state-

ment that Armistead had the title and the right to sell; or would have elicited from Fuller the assurance that Armistead's conveyance would give him a good title.

The general doctrine applicable to a purchase from a trustee is stated in the text of Story's Equity Jurisprudence 77, that a trustee binds his *cestui que trust* by a sale to a *bona fide* purchaser for a valuable consideration without notice of the trust.

And more particularly Judge Story states the rule as to the rights of a purchaser where the proceeds are applied to the purposes of the trust:

"It seems to be considered that where the trustee holds the legal title in trust property, with the power to convert the same into money and apply the money to the purposes of the trust, a *bona fide* purchaser will hold the property free from all trust."

A *bona fide* purchaser who has acquired a legal title and possession from the trustee will be protected in equity against the *cestui que trust;* for by his purchase of the legal title he has the advantage at law, and having paid his money without notice his equity is equal to that of the *cestui que trust.*

2. I respectfully submit the question to the court whether the trust claimed by Bratton is capable of enforcement.

Such a trust is required to be in writing.   Code 1871, §§ 1296, 1297; 2 Story's Equity Jurisprudence, § 1531.

The answer denies that there was ever any declaration of trust signed by Armistead.

3. Armistead had authority to sell the land, and Fuller also had authority to sell, limited only to the price per acre.   Bratton had practically abandoned the land.

4. Bratton is estopped by the representations of Armistead, of Fuller, and of Fleming.

COOPER, J., delivered the opinion of the court.

The objection to the enforcement of the trust set up in the bill because the same was not made or manifested by writing is untenable.   The money by which the debt due to Reid and Mathews was paid was the money of the complainant, though raised on the

joint credit of himself and Armistead. From this fact a trust resulted in favor of the complainant by operation of law, and the statute of frauds has no application. Code of 1880, § 1296 ; Code of 1871, § 2896 ; *Cameron* v. *Lewis,* 54 Miss. 76 ; *Taylor* v. *Mosely,* 57 Miss. 544.

The defense interposed by Rogers that he is a *bonâ fide* purchaser for value without notice of the complainant's rights is not supported by the evidence.

Aside from all the other circumstances shown, he is driven from this position by the isolated fact that at the time of his purchase the lands were in the actual occupancy of the complainant by his tenant, Butler. *Taylor* v. *Mosely,* 57 Miss. 544 ; Notes to *Basset* v. *Nosworthy,* 2 Leading Cases in Equity 1.

Rogers knew under whom Butler held possession by the form of the accounts kept by him on the books of Fuller & Co., of which firm he was a member, and he confessedly bought in recognition of the existence of this lease, for possession was only to be delivered to him at the expiration of the term.

There is nothing in the record indicating that Fuller was the agent of Bratton to make statements which would strip him of his equitable title to the land. If Rogers in good faith relied upon such representations he ought, as against the complainant, to bear the consequences of his own folly. The extent of his right would be to hold Fuller liable for the false statement by which he was induced to invest in the property.

Nor is complainant estopped to deny the right of Armistead to sell the lands in 1878 by the fact that in 1877 he had authorized him to dispose of them at a certain fixed sum. The question is not what power Armistead had in 1877 but what he had in 1878; and in addition to this it is not shown that a sale on the terms of the one made would have been within his authority in 1877.

*The decree is reversed and cause remanded.*